Good morning, Your Honors. My name is Jayam Behar, and I represent Mr. Abbas Ghashghaee in these proceedings. What did he say? Ghashghaee. It's a tribe in Iran. Your Honors, the primary issue in this matter is not really whether Mr. Ghashghaee is qualified for asylum. That has already been found by both the immigration judge and by the Board of Immigration Appeals in each one of their own proceedings. The immigration judge found that he met the objective fear standard, and the Board of Immigration Appeals reversed him as to the subjective finding that, in fact, he also met that standard. The reason why Mr. Ghashghaee was denied asylum and also, well, not, and also his motion to reopen was also, to remand was also denied, was because he was found to be a persecutor by the immigration judge, and that was affirmed by the Board of Immigration Appeals when it adopted the judge's decision. The reason why Mr. Ghashghaee was found to be a persecutor is because he participated, he testified that he participated with the SAVAK organization, the police organization in Iran, and reported on the seditious activities of individuals in the places where he was employed. He was used as an informant. He was under the direction of a general of the Shah's army, and his job was to observe and report on seditious activities. Now, in his testimony, as a collateral matter, Mr. Ghashghaee, when he was asked who these people were, he said they were primarily Islamic fundamentalists and communists, and the court and the government seized on that statement to distort the record and find that, in fact, Mr. Ghashghaee was a persecutor. Let me ask you this, and I'm going to try and change the perspective on this. Let's imagine that we have someone who is opposed to a particular regime, and let's assume that the regime is somewhat autocratic. The person, because of his or her opposition to the regime, is imprisoned because of that political opposition. The person escapes from prison or is released from prison, but with a very clear understanding that if you continue your political opposition, we will imprison you again because of your political opposition to the regime. That person comes to the United States. Does that person have grounds for asylum here based upon persecution in that country? If the imprisonment took place in the other country strictly on the basis of his political opposition to the regime at home, to the autocratic regime, I believe he would have a claim to request asylum. Because of persecution in his home country? Because he was opposed to the regime and because he was being jailed, not for crimes, but because of his opposition to the regime. And that is, therefore, persecution under our asylum statute that entitles him to asylum? Probably. Now, of course, you can see where this is going. My question is now as to your client, when the question is whether he is a persecutor, do we apply the same definition of persecution in deciding what he's done as we do to the definition of persecution of someone who's coming here seeking asylum because he or she has been persecuted? Because he's clearly assisted in imprisoning these two men. These two men were imprisoned because of their opposition to the Shah's regime. So do we apply the same standard as to what constitutes persecution? Your Honor, with all due respect, I think that these people were not prosecuted for their opposition to the regime. That was collateral. Why were they prosecuted, then? They were prosecuted because they were – they had seditious – they were planning seditious activities. That sounds like opposition to the regime. Was it just an opinion they held or was it because they were trying to overthrow the government? The testimony was that they were planning to overthrow the government and they were working with the Khomeini people to try to overthrow the government. And I think history shows exactly what happened. Khomeini did overthrow the Shah of Iran and did create an Islamic fundamentalist state. In other words, they were very much opposed to the regime. Your Honor, every person has a political opinion. That's correct. I think it was Karl Marx that said that everything is political. And you can't – I live in Berkeley. I understand. Very well. Then with that in mind, when a person – when we attribute that every action that a person takes is in some way politically motivated, that – I think that goes without saying. But the question really is, does he infringe on the law when he – does he break the law when he commits certain acts? I find – I take the Symbionese Liberation Army that was active here in the late 70s. They had their political agenda, but they were robbing banks, kidnapping Patty Hearst and so on. They were treated as criminals. But there's something in our law – in fact, in our asylum and persecution law that says opposition to an autocratic regime is treated differently from opposition to a democratic regime where the channels of democratic change are open and available. So we have the Symbionese Liberation Army in a democratic country. That's different from political opposition to an autocratic country where democratic change is difficult or impossible. I mean, that's our case law. I understand. However, I am sure that if we ask the Symbionese Liberation Army, they would find that the United States was autocratic and that they had no voice in how to change the government. Was the Khomeini regime intending to put in a democratic regime in Iran? Was the Khomeini regime trying to do that? Absolutely not. They've got their full-fledged members of the Axis of Evil now, aren't they? They are, Your Honor. They are certified. In other words, we've got political opposition that's available to them too now, right? I guess so. And I guess just to respond to your question, the bottom line was these people were imprisoned for their criminal acts, not because they were opposed to an autocratic government. And there was no testimony, there was no evidence whatsoever in this case that they were punished because they were trying to take down an autocratic regime. Well, that's a question that does seem to me may cut your way. How much, if anything, is there in the record as to the channels of change available under the Shah's regime? That is to say, how autocratic was it? In other words, how do we treat protest against that regime? Is it synonymous with protest against, I don't know, the current government of Myanmar? Do we have anything on the record as to that with respect to the Shah's regime? Your Honor, I tried this case, and to my knowledge, there is absolutely nothing. This whole thing about – And whose burden is it to put that into the record if the argument is that there were some channels of democratic change that were available, and therefore, this should be treated as something that's bad or good? I would think that it would be the burden of the government. And the reason for that is that Mr. Gashkai has testified – his burden is to testify that – why he would be persecuted. And he said why he would be persecuted, because he assisted in putting these people in prison, getting them prosecuted and convicted for crimes. Now, if the – during the examination, I believe it was probably cross-examination, he was asked who these people were, and as an afterthought, he said, well, they're mainly Islamic fundamentalists and communists. But – Communists, it means just a buzzword, like maybe the Americans will hate communists. I mean, what evidence do we have that they were communists? There is no evidence that they were either fundamentalists or that they were communists. The only evidence is his testimony, Your Honor. He does not have any records on this. I mean, his testimony is, of course, evidence. I agree with you on that. Yes. The judge in this case – Excuse me. Did the people who get imprisoned, didn't they become high-ranking officials in the – Yes, they did. – in the Soviet regime? They did. One was a cabinet minister, and the other one became the – one of the heads of the Sapa Bank, which is where Mr. Gashkai – one of the places where Mr. Gashkai worked. The judge in this case, in his opinion, said that Mr. Gashkai testified that he believed that what he was doing was correct under the Shah's law at the time, and that he was reporting on individuals' activities that would be political in this country, and that because of their incarceration, that would be, in the judge's opinion, persecution. This court rendered a decision in the Lepnik's case in which it held that the – a person's actions need to be considered in the context in which they occurred. When the judge finds that Mr. Gashkai is acting in conjunction with the law in Iran at the time, and he's doing what he deems to be his civic duty, then that cannot be termed persecution. The judge also found that Mr. Gashkai's brother corroborated that Savak treated people severely. So does the United States government. The United States government takes very severe action against people that attack it, and all I need to do is point to Afghanistan, current-day Iraq, the detention of detainees in Guantanamo because they are suspected al Qaeda members. Severe treatment does not mean persecution. Thank you very much, Mr. Behar. May it please the Court, Your Honors. My name is Robin Bly. I represent the Respondent in this matter. It's the government's contention that the BIA properly found that petition was barred from asylum and withholding under the assistance and persecution exception. And the Board's decision should be given deference. The substantial evidence in the record supports the Board's finding. Petitioner admitted that he worked as an informant for the Savak to assist in the primary objective of cleaning the country of people who were opposed to the Shah's regime. He stated that he provided information about people who were against the Shah's regime. He knowingly and enthusiastically did this job for six years initially, and then he was helping funnel bank funds from the Safav Bank to former Savak agents after Khomeini came into power. Was this around the time that the Shah was our ally? The initial, when he was an informant, yes. In fact, the Shah was in the United States. Wasn't he getting treatment in San Antonio, Texas? Your Honor, I really don't know. That would trigger the taking over of our embassy that President Carter allowed the Shah to come in for? I'm sorry, Your Honor. I was kind of young. I'm sorry. And didn't the Shah speak at the Harvard graduation in 1968? I was born that year, Your Honor, so I really can't speak to that. I was there. What I'm getting at is, I mean, you remember the embassy takeover, right? Yes, yes. And what triggered that was that the United States allowed the Shah to come in for treatment, and then Khomeini, that's what got the revolution up and running, and the rest was history. Well, Your Honor, there's nothing in the statutes to say that if we back the country, that a person that is pro-Shah and we back the Shah, if he persecuted someone, he doesn't fall under this exception. Why is this persecution and not simply the incarceration of people who are trying to overthrow the government? Because there's no indication that these – I don't remember any indication in the record that they were actually taking substantial steps to overthrow the Shah. I mean, to me, it was more me standing – Well, what did you prove? What did you prove that they were persecuted? I think he said – I think it was that they were – had anti-Shah sentiment, not necessarily they were going to overthrow the – I understood they were convicted of sedition. Well, Your Honor, they may have been convicted under sedition, but who knows what that was at the time. The evidence in the record doesn't seem to really indicate that they were – Isn't that cut against you, then? It could possibly. Let me ask you this, too. Judge Fletcher's point about the Shah not being one of the world's great Democrats is true. This was an autocratic regime. But by the same token, the regime that he was informing on turns out to be even worse. Wouldn't you agree? Isn't the Islamic Republic of Iran even worse than what the Shah had? Yes, I would agree, Your Honor. I mean, Khomeini makes the Shah look like Thomas Jefferson, doesn't he? I mean, I don't really know what the Shah was like, so I will take – I mean, wouldn't – if – I would agree with you based on what you said. I would understand your point a little better if we're talking about freedom fighters who are trying to bring democracy to Iran, but what they brought instead was not democracy or even intended to bring democracy to Iran. What they intended to bring was an Islamic fundamental republic to Iran. But I don't – Which wound up killing even more people than the Shah did. Yes, Your Honor, but I don't think – the statute doesn't talk to that. It just talks to his aiding, abetting – what is it, the wording – ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group or political opinion. It doesn't talk about what will happen if the person that he actually persecutes, they overthrow the government and a worse government comes in. That's not what any of the statutes that cover the persecution talk about, persecutors exceptions. They might have thought that the Khomeini government was going to be a model government. And, of course, many model governments are not democracies. And they might have made a mistake. Who knows? They might have thought the government they ended up with was exactly what they wanted. I'm not sure. Or if they're in the cabinet. One of them is, and one of them is a high-ranking official. So, I mean, they've done fairly well here. But I want to go back to the point of persecution at the time that these two men were informed upon and then went to prison. Because it is persecution if they are engaged in anti-governmental activities because of their political viewpoints. If the government – and this is, I think, just our case law – if the government against whom they are protesting or against whom they are working does not allow avenues for democratic change. I think that's the law. Do you agree with that? Yeah. Whose burden is it to show what kind of a government the Shah had and that, therefore, this is persecution?  Or even if it was the government's burden. Let me back up a step. Whose burden is it to show, in order to defeat the asylum claim, that this man himself was a persecutor? That Mr. Gashkai was a persecutor? Whose burden is that? Is that the government's burden? Your Honor, I believe it probably would have been the government's burden. And is it part of the government's burden, then, to show that, okay, this package of what happened to these two people was persecution, including that, okay, the political viewpoint they had was not punishable without its being persecution because of the nature of the Shah's government. Is that part of your burden? Probably, yes. Yeah, and there's not much in the record on that point. There's not much in the record. I have a sense. I mean, I read, but I'm not sure whether what I read is necessarily available to me. Well, Your Honor, I think part of the problem with the record is, is that he didn't come in until 1995. Obviously, the Shah was out of power by the late 70s, and so there wouldn't have been a lot of information. Oh, there's a great deal of information. Well, I'm thinking more in the country reports, Your Honor. I'm not speaking to other things. And it might have been difficult and expensive for the government to assemble the information, but the truth is the information is available as to what the nature of the Shah's government was. Oh, I'm not contending that it's not, Your Honor. I'm just thinking more in terms of the country reports and what is in the record. Yeah, well, but what could the government have put into the record is my question. I mean, I don't know. I'm sure there's information, as you said, that there is information about the Shah and everything else in the SAVAK, but it's just not in this record. The only information is in the 1996 profile, which indicates that high-ranking SAVAK members were executed and prosecuted immediately after the Khomeini regime took power, but that lower-level SAVAK members were not persecuted and were basically left alone to fend for themselves. How about embezzlers for SAVAK? Well, Your Honor, I mean, that's a crime. If someone's sitting here in this country and they're embezzling money, embezzlement's a crime. So is sedition. Well, Your Honor, I mean, it's persecution if the attorney general says it's persecution, and in this case he said, both through the IJ and the board, that he persecuted these people, and there's also a case that I believe we cited in our brief, Matter of B. I don't have the site in front of me, but it's in our brief, where an alien was an Afghan. His brother was a supporter of the Mujahideen, and he was actually incarcerated because of his anti-Afghani government stance, his brother's anti-Afghanistan stance, based on his brother's stance, and that was considered persecution. I mean, in the record, and I have to state that I do not remember specifically, but it appeared to me that he did not, neither of these people were actively trying to overthrow the Shah or anything like that. It appeared more that they were making statements like, I oppose the Shah. Are you making this up or just in the record? No, no, Your Honor, as I stated, I don't remember, but to me that's how I took it. We don't know what he did. In fact, it would seem like the inferences are just the opposite, given that they became high-ranking officials in the government. I don't know that the inference is opposite. I mean, they may have been pro-Khomeini, but that doesn't mean, I'm sure there were a lot of people that were pro-Khomeini that are not members of the government. Let me ask you the flip side of Judge Fletcher's question, which I think is kind of intriguing. Suppose this guy, this applicant, had informed on the Ayatollah, and the Ayatollah had then been imprisoned. Would the Ayatollah have been entitled to political asylum here? Your Honor, I honestly can't answer that. I mean, that would require me to speculate, and I think that that has to do with so much with political, it would have political ramifications and everything else. We're not talking in these groups. Let me ask it this way, would it have constituted persecution of the Ayatollah? I think he could probably make the claim. I don't know that it would stand in the U.S. courts. Thanks. Anything else? Thank you. Thank you very much, Ms. Black. Or you used up your time, but if you want 30 seconds, we'll give it to you. You don't have to if you don't want to. Thank you, Your Honor. Your Honor, I would simply want to point out that there was a substantial body of information available, not expensively. The State Department produces State Department reports, country reports, every year. And if the government wanted to submit country reports on what Iran was like in 1979 or 1980 or at any time, all they had to do was request them, they're free. And the government did not produce any evidence, and it was their burden. After he makes the assertion that he's entitled to asylum and he's being persecuted or he fears persecution, then at that point I believe the burden shifts to the government to show that he is not entitled to it. Thank you. Thank you. Ms. Black, thank you. The case just argued is submitted. Next case is 0272104. Corrine. How do I pronounce that? Corrine. Corrine. Corrine versus Ashcroft Eastside has ten minutes. Thank you, Your Honor. Good morning. Good morning. May it please the Court. My name is Elif Kellis, and I represent the Petitioners Alex Corrine and his young daughter Daniella. This Court should hold that the Board's decision not to grant Mr. Corrine and his daughter asylum or withholding of deportation to Latvia lacks the support of substantial evidence. Any reasonable finder of fact would be compelled to conclude that he and his daughter have well-founded fear of future persecution in Latvia because he is of Russian descent and she is of Belarusian and Polish descent. This case is about statelessness and the evidence required to establish persecution based on ethnicity. It is important to remember that Mr. Corrine arrived into the U.S. in 1993 when citizenship and naturalization continued to be the most controversial issues in Latvia. In fact, there was no right to citizenship for non-Latvians in 1993. Also, Mr. Corrine and his wife, who was not in proceedings, was denied registration. His registration had to be extended since he was a non-Latvian. However, in 1993, he and his wife were denied registration in that country. However, the immigration judge in this case, in her opinion, stated erroneously that Mr. Corrine had a stamp in his passport, which was evidence of registration. What does registration mean? Registration means that they have a right to live and work in Latvia, which is different from a propiska. And the judge in this case confused the propiska stamp, which was the circular stamp placed in his passport, which identified him as an ethnic Russian. She confused that with registration. And what does the propiska stamp allow? The propiska allows him to live in a certain area of Latvia. And to work also in Latvia? The propiska, the record does not indicate that. There was discussions about that, and Mr. Corrine said that it did not in his testimony. He says that he can live in Latvia, but he can't work? That's correct. And I'm glad that you brought that up. I missed that, I think. I believe in his testimony he stated that the propiska was different from registration. I understand that part, but the part that he said he couldn't work in Latvia. Well, Your Honor, he did testify that he lost his job. He had a government job and so did his wife. Losing a government job is different from I can't work in Latvia. Perhaps Mr. Corrine did not state that, but I believe he did identify the difference between registration and a propiska, which is a circular stamp. This Court has held in both two cases that a probability of deliberate imposition of substantial economic disadvantage upon a person for reasons of race, religion, and political opinion is sufficient to confer upon the Attorney General the discretion to withhold deportation. Those two cases are Kovacs v. INS and Desir v. Ilchert. Now, Latvia has denied certain types of jobs to non-Latvians. The Immigration Service relied on a U.S. State Department report that indicates conditions in Latvia are perfectly fine for ethnic Russians to return. However, the Latvian laws on citizenship mandates that a significant portion of the population must remain non-citizens for a very long time. It was structured. Not everyone was allowed to apply for citizenship when the law came into effect, I believe, in 1994. As I understand it, the BIA, or maybe it was the IJ or both, said that there's no question there's harassment and there's discrimination, but as reprehensible as that is, it doesn't rise to the level of persecution. What's the response to that? The immigration judge stated that in her opinion, that the harm suffered by Mr. Korine and his family didn't rise to a high level of persecution. However, Your Honor, persecution is defined as an infliction of harm or suffering upon a person who defers in a way regarded as offensive. That's the plain definition of persecution. And where are you getting that definition? I believe Webster's, Your Honor. It's being quoted in cases from this circuit. I can't tell you a specific case, but the last time I checked, I believe this Court referred to Webster's in their decision. And I believe that De Seer v. Ilshert or Kovacs v. INS does have that definition of persecution. But to be persecution under the statute so as to allow asylum, it's got to be to a certain level of, I don't quite know what the right word is, harshness or severity. Some bad treatment on account of a protected ground, race, religion, politics, whatever. Just because there's some bad treatment, that's not necessarily enough. It has to rise to a certain level. Your Honor, the definition is treatment that is regarded as offensive. Treating someone differently because of their race, religion, nationality, political opinion, social group. Well, if they just called her names, for example, if they just called her dirty names, that wouldn't be persecution, even though it's offensive? Over a period, for example, calling someone names and the person is a member of a group that is discriminated against and persecuted, and if there's a pattern of practice, maybe the person hasn't been singled out for persecution, but there is a pattern of practice in that country of persecuting such types of persons, then yes, it is persecution, because our immigration laws permit granting asylum and withholding to someone who is a member of a group, and there is a pattern of practice in that nation of persecuting such persons, and the person doesn't have to be singled out for severe treatment or severe harm, Your Honor. And that's in the regulation, I believe it's 208.16, if I'm not mistaken, of the CFR. When Latvia gained independence in 1991, all non-Latvians in Russia were segregated into five different groups for eligibility for citizenship in the future, and the law didn't come into effect until 1994, and I believe it was amended in 1995. Even though persons had been living in Latvia all their lives and born there, they had no right to vote, they were excluded from occupying certain state and public positions, they were also denied some professions in the private sector, and they couldn't own land or property. This was a deprivation of social and economic rights. And also contrary to the government's position that Russians would be eligible to live and work in Latvia, there's de facto discrimination, laws prescribing the types of employment that they could be engaged in, their social benefits, land ownership, and also the passport that these people hold still bears their ethnicity. That's still in the Latvian law as we speak, that still has not been removed. Also... I think I'll reserve now, thank you. You're back. Yes, it's the last time. In response to where in the record it discusses the propuestas and the registration, it talks briefly on pages 114 and 115, I believe there's other portions, but when I was looking through the record really quickly, that's where I could find it. Do you agree with opposing counsel that the petitioners were not able to, the petitioner and his wife were not able to work with the papers they had? Your Honor, I don't, it's a little confusing in the record what exactly these different stamps let him do, and at one point he admitted he was employed by the city or the government, and his wife was too, and then they lost their jobs, but he didn't say really why or when they had lost their jobs, and then he said he had started a business but had been unable to get a license, or there was some sort of problem that he couldn't continue with that business. If we assume that the petitioner and his wife could not obtain employment, would that constitute persecution in your view? No, Your Honor. And why not? Because the law doesn't talk about not being able to find a job, it talks about persecution based on race, religion, ethnic group, and there's nothing to indicate that they lost their jobs because they were not ethnic Latvians. If they did lose their jobs or were unable to get jobs because of their ethnicity, would that constitute persecution? It might, Your Honor. It might. But there's no evidence in this record why or when he lost his job, or either he or his wife lost their jobs, and what the reason was. To the extent that they argue they lack citizenship problems, they now, it appears under the Latvian law, would be able to obtain Latvian citizenship or Russian citizenship because the Latvian, I'm not sure if it's the profile or the country report for 1997, indicate that former persons from Russian, what used to be the USSR, who declined to accept citizenship from whatever country they are living in, are eligible for Russian citizenship. So they would have Russian citizenship if they so desire, and they are not stateless, as they contend. So what's your bottom line in terms of why the petitioners do not merit asylum? They haven't shown past persecution. The only evidence that they've indicated with any specificity is the fact that in 1993, his family and eight others, or six non-Latvian families, were taken off a bus, had their documents checked, were taken to a police station, were held overnight, and, well, anywhere from 15 to 24 hours, now I'm wearing the record. And that he was beaten, but he doesn't really say how severe the beating was, how long the duration of it. He's indicated nothing like that, and he was able to leave. That happened in 1993. He remained until 1995 when he came to this country. Over two years had passed since that time. He alleges that people went to his home and put leaflets on the door basically saying get out. You know, it was a Soviet-built apartment building. It basically was full of non-Latvians. He admitted that his family was not the only ones who had experienced this. There's just nothing really in this record. This one incident does not arise to the level of persecution. Persecution has been called an extreme concept. Though we might find this type of behavior unacceptable in the United States, it's not to the extent of maybe other forms of harm that have occurred to people who have actually gotten asylum and been found to have been persecuted. He also relies on the fact that – oh, I'm sorry. I'm just going to read from the transcript. I'm starting on page 89 of the administrative record, but I'm not sure you need to follow along with me. Question, what other problems do ethnic Russians have in Latvia? Answer, this is from Mr. Korine. There are lots of social issues. If you are not registered as a resident or a citizen of Latvia, you're denied employment and all social guarantees, apartment. Sometimes you're denied medical help. Were you denied any of these things? I'm skipping. We were basically fired from our jobs, my wife and me, because they required you to be a Latvian nationality because at the time there were no citizen status required yet in Latvia. Basically all decisions were made from nationality status. My wife was fired from the architectural government institution, and I was fired from the governmental civilization company in Latvia in Riga. Now, that sounds as though – I mean, that's pretty explicit. It may or may not be true, but that's pretty explicit testimony as I read it. My wife and I were both fired from our jobs because we were not Latvians but rather Russians. Your Honor, there's no indication when that took place or anything indicating why other than his statement, though he was found to be. But if you believe it, that's what happened? Yes. And that's why it happened? According to him, yes. I see, if you believe it. Now, if you believe that, is that persecution sufficient to establish asylum? Your Honor, I don't think so, because he later on goes on to talk about how he was able to start a business. I mean, he didn't get whatever he needed, a business license or whatever, but he said he was able to start a business, and he remained there who knows how much longer after he lost his job. I mean, it's unclear from the record. Maybe if he had stayed there, if he had lost his job in 1993 but been able to – didn't leave until 1995, somehow he was supported and supported his family. So money was coming from somewhere. If he left in 1995 after he had been fired in 1995, then maybe, yeah, that might make a little more sense to me. He came to the United States in 1992 on business, is that right? Yes. Do you know what business that was? No. And he came by himself, and then he returned. He returned to Latvia? Latvia, yes. Stayed there another five years? No, stayed there another three years, Your Honor. He came in 1995. I marked on 97, is that right? 97, I think is right. Maybe I'm misreading my notes. But anyway, he came here on a business trip after he had been fired? We don't know, Your Honor. He doesn't say when he had been fired. Then went back and stayed there for a period of time, two, three years, whatever you said it was. To do whatever he was doing, yes. Came here on a visitor's visa? Yes, with his family. The incidents that he describes are more in the form of harassment and discrimination and not persecution. They don't rise to that level under this court's case law, and we would state that he has not met his burden of past persecution. And because of the changes in the laws in Latvia, there's no – he didn't establish past persecution. There's no evidence that he'll suffer future persecution if he goes back to Latvia. In addition, you know, it says that social benefits – some place in the record it says that social benefits were a problem in obtaining for non-Latvians, but his mother lives in Latvia. She gets her pension from the Russian government, so it appears that she is able to support herself. And maybe it's not from the Latvian, but she also didn't live in Latvia for a long period of time. But the key there is support yourself by a pension from Russia, you said, not from Latvia. That's correct, Your Honor. But she also – there's no indication that she ever worked in Latvia. I mean, she was born in Russia. She left when Mr. Korine was 1 years old and didn't return until he was 17. So there's no indication that she would have gotten a Latvian benefit. It's not clear from the record whether she worked there at all. Well, but what I'm saying is the fact that the mother can live there supported by a pension from the Russian government doesn't say much about whether he can live there working. Well, Your Honor, it seems to – I mean, there have been changes that have been implemented slowly, but they do appear to have been implemented and that he could go back and work and raise his family. When you say there have been changes, what's your evidence in the record for those changes? Your Honor, the citizenship law, it looks like he would be eligible to apply for that under the citizenship law that was implemented over a seven- or eight-year period. I don't have the record in front of me right now, Your Honor, but there is something in there that gives like a gradual every year, so these people will be able to apply the next year. In summary form, your argument is that, well, whatever might have happened at the time of the earlier firing, he's not giving us current testimony as to what the situation is in Latvia or would be. Yeah, there's nothing in there that says that he couldn't find a job or anything like that. He was basically speaking to what was going on when he left, and there's nothing to indicate that now that would be the case. I mean, the Latvian government has taken pains to address concerns for the non-Latvians. There's evidence in the country reports and things like that to indicate that. Thank you very much. Thank you. Ms. Kelsey, you have about a minute left. Okay. Your Honors, Mr. Korine came to the United States in September of 93. He did not come in 1995. When they arrived in September of 93, they remained and did not leave the U.S. since that time. In fact, they have a U.S. citizen's son now. The government states that Mr. What was your business after he got fired? I don't know, Your Honor. It's not in the record. The government states that Mr. Korine and perhaps his family may qualify for citizenship. However, you have to speak Latvian. And when Mr. Korine grew up in Latvia and studied there, it was under the Soviet regime. Everyone spoke Russian. Only the Latvians spoke Latvian. Mr. Korine says he knows some basic words in Latvian, which would not qualify him for citizenship because you have to know the language and you have to have also a residency requirement before you can become a citizen and know Latvian civics and so forth. So that's clearly wrong. Also, that Mr. Korine may be able to go to Russia. This is one of the issues also in the case is that at the outset of Mr. Korine's hearing and his young daughter, the attorney that was representing them claimed that they were stateless. And at that point, they were asked to designate a country of deportation if that should become necessary, and they failed to designate a country. At that point, the regulations demand that the immigration judge state the country of deportation. And we know the judge got that fouled up and shouldn't have done it that way, but then the BIA says, well, there's no harm, no foul, because he was already there prepared to talk about Latvia. I disagree with that, Your Honor. The reason why is though the judge ultimately ordered the alternate deportation to Latvia when she denied his asylum and withholding, in her opinion, she kept talking about Russia. And he didn't have an opportunity to submit evidence about Russia. Obviously, the judge was very slave. He was deported to Russia. He was deported. He's not being deported to Russia. No. That was not one of the countries. It was designated by the government. Latvia and Russia both were designated by the government at the end of the hearing. At the end of the hearing, the attorney for Mr. Cornyn and his young daughter stated, the government has not proved by clear and convincing evidence their alienage, because there was nothing in the record. There was no birth certificates in the record. At that ---- Didn't they concede the alienage issue? Wasn't that conceded at the outset? No, Your Honor. The attorney that represented them in the court stated that he was denying allegation number two on the order to show cause with the allegations of why they're deportable. And allegation number two said you're a native of Latvia and a citizen of Russia. The attorney denied number two, and so the judge said, are you saying that they're not natives of Latvia? And so the attorney said, well, yes, they're natives of Latvia, but we're denying that they're citizens of Russia, they're stateless. Well, if they're ---- Okay. So you're saying the fact that they said they were natives of Latvia didn't establish that they were aliens? Is that your argument? Well, yes, Your Honor, especially for the daughter. Now, Daniela, her ---- no one alleged that she was a native of Latvia. Going through the transcript, the judge never took allegations for the young daughter. And also the ---- in the record, the transcript, it says indiscernible. When Mr. Corwin says my daughter was born in, it's indiscernible. But weren't those admissions incorporated into the daughter's application as well? I don't know any regulation or statute that would incorporate her citizenship or her alienage to her father, Your Honor. All right. Thank you. Thank you. Thank you very much, Ms. Kallis and Ms. Blatt. Thank you. The case just argued is submitted.
judges: Silverman, W Fletcher, Rawlinson